IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KRAIG D. ROBERTS, | ) | CASE NO. 5:12CV1528 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, [1] | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff Kraig D. Roberts ("Plaintiff" or "Roberts") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act

(the "Act), 42 U.S.C. §§ 416(i) and 423.  Doc. 1.  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties.  Doc. 15.  For the following reasons, the final

decision of the Commissioner is **AFFIRMED.**

## I.  Procedural History

Roberts filed an application for DIB on August 5, 2009, alleging a disability onset date of

August 15, 2008.  Tr. 103-04, 125.  He claimed that he was disabled due to a combination of

impairments, including degenerative disc disease, diabetes, failed back syndrome – status post

microdiscectomy decompression, morbid obesity, and bipolar disorder.  Tr. 37-38, 68-71, 125.

Roberts' application was denied initially and on reconsideration.  Tr. 68-75.  At Roberts' request,

on November 14, 2011, a hearing was held before Administrative Law Judge James P. Nguyen

(the "ALJ").  Tr. 34-65.  On December 8, 2011, the ALJ issued a decision finding that Roberts

was not disabled.  Tr. 6-21.  Roberts requested review of the ALJ's decision by the Appeals

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she is hereby substituted for Michael J. Astrue as the Defendant in this case.

Council on February 27, 2012.  Tr. 7.  On April 11, 2012, the Appeals Council denied review,

making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II.  Evidence

### A.    Background

Roberts was born on December 28, 1962, and was 45 years old at the time of the alleged

onset date.  Tr. 66.  He graduated from high school (Tr. 26) and has past relevant work

experience as a machine mechanic/servicer, assembler, welder, material handler, and machine

builder.  Tr. 25.  At the time of the hearing, Roberts lived in a house with his wife.  Tr. 39.

### B.    Medical Evidence

#### 1.    Physical Impairments

##### a.    Treatment History

On September 23, 2008, Roberts presented to orthopedic surgeon Scot D. Miller, D.O., at

the Crystal Clinic, for evaluation and treatment of low back pain and recurrent thigh pain.  Tr.

202.  A physical examination revealed that Roberts' sensation, reflexes, strength, coordination,

gait, and station were within normal limits.  Tr. 201.  A straight leg-raising test was negative and

there was no evidence of atrophy.  Tr. 201.  Dr. Miller noted that Roberts walked with a slightly

flexed posture.  Tr. 201.  An MRI of the lumbar and thoracic regions revealed an epidural fat

collection on the right at T12-L1.  Tr. 201, 306.  In addition, x-rays revealed multilevel

degenerative changes primarily at L5-S1 and L2-3.  Tr. 203, 309.  Dr. Miller stated that Roberts

was a non-operative candidate and prescribed Tylenol #3.  Tr. 203.

Roberts saw a pain management specialist, Dhruv Shah, M.D., M.S., on October 28,

2008, with complaints of lower back pain.  Tr. 207-08.  Roberts described the pain as radiating

pain and tingling and numbness in the right lower extremity.  Tr. 207.  Upon examination, Dr.

Shah noted that Roberts had tenderness in his lumbosacral region and right gluteal region.  Tr. 207.  Dr. Shah also noted that Roberts did not have any atrophy of any muscle in the right or left lower extremity and no motor or sensory neurological deficit except for minimal paresthesia on the lateral aspect of the right leg.  Tr. 208.  Roberts' straight leg-raising tests 2 were negative, as were sciatic nerve stretching tests bilaterally.  Tr. 208.  Dr. Shah's impression was multiple disc bulges with facet hypertrophy in the lower lumbar spine and foraminal stenosis at L4-L5 level with right lumbar radiculopathy.  Tr. 208.  Dr. Shah discussed various treatment options with Roberts, including physical therapy and lumbar epidural steroid injections.  Tr. 208.  Roberts opted for epidural steroid injections.  Tr. 208.  Dr. Shah performed a series of three lumbar epidural steroid injections in November and December 2008, as well as bilateral facet joint injections at L4-5 and L5-S1 in January 2009.  Tr. 233-35, 294-301.

At a follow-up visit with Dr. Shah on January 30, 2009, Dr. Shah noted that Roberts' pain was mild in intensity after facet joint injection and that he had better pain relief with the facet joint injection than the lumbar epidural steroid injection.  Tr. 206.  Roberts stated that, overall, he was happy with pain control and was ready to return to his regular job full time.  Tr. 206.  Similarly, at an appointment with Dr. Shah on March 2, 2009, Roberts again reported significant relief of his low back pain after facet joint injection.  Tr. 637.

Roberts' primary care physician during the relevant period was William Ritchey, D.O., at the Kenmore Family Practice, whom he saw for routine care for a variety of ailments.  Tr. 315-16, 340-41, 748-54, 893-94.  At an appointment with Dr. Ritchey on February 26, 2009, Roberts reported that he had not been sleeping the past 2.5 weeks and was under stress at work.  Tr. 339.  Dr. Ritchey noted that Roberts was anxious and prescribed Xanax until Roberts could see a psychiatrist.  Tr. 339.  At a visit on April 10, 2009, Roberts reported that his back pain had

returned.  Tr. 316.  Dr. Ritchey re-referred Roberts to Dr. Miller at the Crystal Clinic for

treatment of his back pain.  Tr. 316.

On April 21, 2009, Roberts presented to the Crystal Clinic for an evaluation of his low

back pain.  Tr. 214.  A physical examination revealed that Roberts mobilized well from a sitting

to a standing posture but ambulated leaning slightly forward in accordance with his large body

habitus.  Tr. 214.  His lower extremity motor function was intact.  Tr. 214.  He was assessed with

low back pain, disc degeneration of the lumbar spine, and mild spinal stenosis.  Tr. 214.  Repeat

x-rays were obtained of Roberts lower back, which evidenced appreciable disc degeneration with

disc space height loss at the L5-S1 level to near bone on bone status and his disc at L2-3 showed

anterior spurring still with greater than half of his normal disc space height.  Tr. 214.  Several

surgical options were discussed, including microdecompression surgery and a lumbar fusion.  Tr.

214.  Roberts opted for a continuation of pain management instead of surgery because he was no

longer experiencing any ongoing or worsening nerve pains or appreciable weakness in the lower

extremities.  Tr. 214.

On April 27, 2009, Roberts returned to Dr. Shah complaining of lower back pain.  Tr.

636.  Roberts stated that he had excellent pain relief from the facet joint injection but that his low

back pain had returned.  Tr. 636.  A physical examination revealed that Roberts could both heel

walk and toe walk with minimal support and had a negative flip sign and straight leg-raising test

bilaterally.  Tr. 636.  Dr. Shah diagnosed degenerative disc disease with facet arthritis in the

lower lumbar spine.  Tr. 636.  Dr. Shah performed radiofrequency ablation of L3, L4, L5, and S1

medial branch bilaterally on May 7, 2009.  Tr. 227, 291-93.  At an appointment on May 22,

2009, Roberts reported tenderness with some reduced range of motion.  Tr. 635.  Dr. Shah

replaced Tylenol #3 with Percocet and Skelaxin and ordered physical therapy.  Tr. 635.

Roberts saw Dr. Shah on July 17, 2009, for pain in both sacroiliac regions with increased pain after prolonged standing as well as when getting up from sitting.  Tr. 633.  However, Roberts reported that he did not feel any pain in his lower back.  Tr. 633.  On exam, he exhibited severe tenderness in both sacroiliac regions with more on the left side.  Tr. 633.  Dr. Shah administered a steroid injection to the left sacroiliac joint to help alleviate the pain.  Tr. 633.  At an appointment on July 31, 2009, Roberts noted improvement of his pain with the left sacroiliac joint injection and requested a right sacroiliac joint injection.  Tr. 632.  Dr. Shah performed the right sacroiliac injection.  Tr. 632.  At a follow-up appointment with Dr. Shah on September 4, 2009, Roberts reported that he had experienced relief from his pain after injections in his sacroiliac joints but that the pain had returned.  Tr. 631.  A physical examination revealed diffuse tenderness in the lower lumbar spine but negative flip signs and straight leg-raising test.  Tr. 631. Lumbar x-rays showed stable degenerative disc disease at L5-S1 and mild facet joint degenerative changes in the lower lumbar spine.  Tr. 620.

Roberts saw Dr. Shah on October 30, 2009 and reported increased back pain. Tr. 629.  He stated that the radiofrequency ablation gave him about 30% to 40% pain relief.  Tr. 629.  Roberts stated that he had better pain relief from the facet joint injections than the radiofrequency ablation and requested facet joint injections in the lumbar spine again.  Tr. 629.  Dr. Shah again discussed the option of a spinal fusion surgery but Roberts stated that he was not interested in spine surgery.  Tr. 629.  On November 5, 2009. Dr. Shah performed facet joint injections at L3-4, L4-5, and L5-S1.  Tr. 539-50.  At a follow-up appointment on November 23, 2009, Roberts reported "very good pain relief" after his injection until he twisted his lower back the previous day.  Tr. 628.  A physical examination revealed that Roberts had tenderness in the low back and buttocks but negative flip signs and straight leg-raising tests and no focal motor or sensory

5

neurological deficit in either extremity.  Tr. 628.  At an appointment on January 5, 2010, an examination revealed a positive straight leg-raising test and difficulty with heel walking and toe walking.  Tr. 627.  Dr. Shah diagnosed morbid obesity, degenerative disc disease with facet arthritis, and questionable osteoarthritis of the right hip.  Tr. 627.  He recommended that Roberts undergo lumbar spine surgery.  Tr. 627.

On February 1, 2010, Roberts saw Rajiv V. Taliwal, M.D., orthopedist at Crystal Clinic for a surgical consultation.  Tr. 594-98, 600.  Roberts complained of ongoing pain in his back going into his right buttock, posterior thigh, and occasionally below his knee.  Tr. 600.  On examination, Roberts was able to forward flex and extend with some stiffness and discomfort in his back and right leg and was able to stand on his toes and heels.  Tr. 600.  His strength and sensation were normal bilaterally but he had diminished knee and ankle reflex.  Tr. 600.  His straight leg-raising test was positive on the right but there was no pain on hip or knee range of motion.  Tr. 600.  X-rays revealed loss of disc height with foraminal stenosis at  L5-S1 with no listhesis.  Tr. 600, 602.  Dr. Taliwal's impression was lumbar disc degeneration with stenosis and he recommended an MRI of the lumbar spine.  Tr. 600.

Roberts saw Dr. Taliwal on February 19, 2010, for a follow-up appointment.  Tr. 598.  Dr. Taliwal observed that Roberts looked "visibly uncomfortable" and he sat leaning off to the left.  Tr. 538.  On exam, Roberts had some leg pain with forward flexion and extension but his strength was normal on both sides.  Tr. 598.  He had a positive straight leg-raising test on the right.  Tr. 598.  An MRI (Tr. 604-05) revealed foraminal stenosis with disc degeneration most prominent at L5-S1.  Tr. 598.  Dr. Taliwal diagnosed lumbar stenosis with disc degeneration at L5-S1 with morbid obesity.  Tr. 598.  He recommended a microdecompression on the right at L5-S1 because Roberts had not responded to conservative care.  Tr. 598.

6

On May 21, 2010, Dr. Taliwal performed a microdiskectomy decompression on the right at L5-S1.  Tr. 652-56.  At a follow-up appointment on June 4, 2010, Roberts stated that he was making good progress overall and that his back pain and leg pain were much improved.  Tr. 745.  Dr. Taliwal noted that Roberts' incision was well-healed and that he had normal strength with a negative straight leg-raising test.  Tr. 745.

However, at an appointment with Dr. Shah on June 21, 2010, Roberts reported that he did not receive any relief following his surgery.  Tr. 710.  He stated that his back and right leg pain were moderate to severe in intensity.  Tr. 710.  On exam, he demonstrated tenderness in the right gluteal region and significant restricted range of motion in the lumbar region.  Tr. 710.  Dr. Shah diagnosed failed back surgery syndrome and degenerative changes in the lower lumbar spine.  Tr. 710.  He continued Roberts on Percocet.  Tr. 710.  Roberts stated that he wanted to change his pain management doctor.  Tr.

At a follow-up appointment with Dr. Taliwal on July 14, 2010, Roberts reported that he had fallen on his right side and had since had a flare-up of pain across his back radiating down his right buttock and thigh.  Tr. 742.  He also reported that his right foot weakness was also worse after his fall.  Tr. 742.  Lumbar x-rays revealed advanced spondylotic loss of disc height at the L5-S1 level.  Tr. 743.  Roberts saw Dr. Taliwal again on July 28, 2010.  Tr. 740.  He stated that his leg pain was much improved but that he had some discomfort across his low back.  Tr. 740.  Dr. Taliwal observed that Roberts looked much more comfortable and that he was able to stand upright.  Tr. 740.  Dr. Taliwal also noted that Roberts' strength in the lower extremities was normal and that he had negative straight leg raises.  Tr. 740.  He recommended that Roberts continue with home exercises and "gradually try to resume activities as tolerated."  Tr. 740.

Roberts had an appointment with Dr. Taliwal on August 20, 2010, and reported that he was making a slow, steady recovery until approximately one week prior to the appointment when he twisted suddenly at his waist and felt a sharp pain shooting down his right leg.  Tr. 832.  Since that time, his pain had increased and he also developed some weakness.  Tr. 832.  An MRI was ordered, which revealed no evidence of any recurrent nerve root compression.  Tr. 831, 900.  Roberts returned to Dr. Taliwal on August 30, 2010, stating that he was experiencing some discomfort in his back radiating into his right leg after being involved in a motor vehicle accident earlier that day.[2]  Tr. 831.  A physical examination revealed that Roberts' lumbar range of motion was "a little stiff."  Tr. 831.  However, Roberts' strength in his lower extremities was normal and he had negative straight leg raises.  Tr. 831.  Dr. Taliwal indicated that Roberts' post-operative MRI, which predated the motor vehicle accident, did not show any recurrent process.  Tr. 831, 900.  Dr. Taliwal suggested chronic pain management and advised Roberts to increase activity gradually as tolerated.  Tr. 831.

On October 12, 2010, Roberts began treating with Norman W. Lefkovitz, M.D., of the Ohio Neuro Center, for pain management.  Tr. 871.  Dr. Lefkovitz reviewed the August 2010 MRI and noted evidence of epidural scar formation in the region of the right S1 nerve root at the L5-S1 level where there was right-sided hemilaminectomy defect identified.  Tr. 871.  On examination, Dr. Lefkovitz observed that Roberts' lumbosacral range of motion was limited to 30 degrees with forward flexion, 5 degrees with extension, and 5 degrees with lateral flexion bilaterally.  Tr. 871.  Roberts also had positive straight leg raise affecting his right lower extremity.  Tr. 871.  A straight leg-raising test was positive in the right leg.  Tr. 871.  His motion strength was normal and his sensation was intact.  Tr. 871.  His gait was mildly antalgic.  Tr.

---

[2] Roberts sought treatment in the emergency room immediately following his car accident.  Tr. 897-99.  He was diagnosed with an acute lumbosacral strain, was given an injection for pain relief, and was discharged.  Tr. 897-99.

871. Dr. Lefkovitz prescribed Norco, a narcotic medication, and advised Roberts to return in one month.  Tr. 871.  At a follow up on November 9, 2010, Roberts reported that his medications helped to reduce pain and he was tolerating them well without side effects.  Tr. 872.  Dr. Lefkovitz diagnosed displacement of lumbar intervertebral disc without myelopathy.  Tr. 872.

At a follow-up appointment on February 11, 2011 with Dr. Lefkovitz, Roberts reported that his medications helped to reduce pain and that he was tolerating them well.  Tr. 877.  His physical examination and assessment were unchanged and Dr. Lefkovitz increased Roberts' dosage of Norco.  Tr. 877.  Similarly, at follow-up appointments in March, April, and May of 2011, Dr. Lefkovitz's exam findings and assessments were unchanged.  Tr. 911-15.  He also continued to note that Roberts' medications helped reduce his pain.  Tr. 911-15.  At an appointment on June 10, 2011, Dr. Lefkovitz's noted that Roberts' extension of the lumbar spine had decreased to zero degrees.  Tr. 909.  Dr. Lefkovitz's assessment remained the same.  Tr. 909. At an appointment on July 11, 2011, Dr. Lefkovitz's examination findings were again unchanged but he added obesity to his diagnosis.  Tr. 907.  At follow-up appointments in August 2011 and September 2011, Roberts reported that his medications were helping to reduce his pain and that he was tolerating them well.  Tr. 903-06.  Dr. Lefkovitz continued to diagnose displacement of lumbar intervertebral disc without myelopathy and obesity.  Tr. 903.

On November 16, 2011, Dr. Lefkovitz completed a medical source statement for Roberts. Tr. 918-20.  He opined that Roberts could stand/walk for 15 minutes at one time but would then have to sit or lie down and recline for 30 minutes at one time before standing/walking again, and could stand/walk for a total of 1 hour in an 8-hour workday.  Tr. 918.  He also opined that Roberts could sit for 30 minutes at one time but would then need to alternate his posture by lying down for 30 minutes at one time before sitting again, and could sit for a total of 2 hours in an 8-

hour workday.  Tr. 918-19.  Dr. Lefkovitz further opined that Roberts would need to lie down or recline in a supine position to relieve pain and fatigue arising from his documented medical conditions.  Tr. 919.  He found that Roberts could occasionally lift up to 10 pounds, could occasionally balance, and could rarely/never stoop.  Tr. 920.  Finally, he stated that Roberts would miss work more than 3 days per month due to his impairments.  Tr. 920.

### b.    State Agency Consultative Physician

At the state agency's request, Roberts saw Paul T. Scheatzle, D.O., for a consultative examination on September 17, 2010.  Tr. 854-61.  Roberts complained of chronic low back pain with right leg radiculopathy.  Tr. 859.  Upon examination, Dr. Scheatzle noted that Roberts had guarding and spasm with palpation of the lower lumbar paraspinal muscles with tenderness, normal cervical lordosis, flattening of the lumbar lordosis, and slightly increased thoracic kyphosis.  Tr. 860.  On range of motion testing, Roberts had marked decreased intersegmental movement of the lumbar spine, a decreased range of motion of the right hip and shoulders, and lacked full extension on the right due to right leg radicular pain.  Tr. 860.  His gait was mildly antalgic and he had pain with heel walking.  Tr. 860.  Straight leg raising test was positive on the right at 40 degrees. Tr. 860.  However, a compression test was negative.  Tr. 860.  Roberts had no leg length discrepancies and no atrophy.  Tr. 856, 860.  Dr. Scheatzle diagnosed Roberts with persistent right low back pain with a right S1 radiculitis with impaired gait.  Tr. 860.  He opined that Roberts could perform only sedentary work with the following limitations:  lifting up to 10 pounds occasionally; no frequent lifting; sitting frequently with the ability to change position every 30 minutes; standing or walking occasionally for 150 feet; no bending or twisting activities; and no climbing or crawling.  Tr. 860.   He also noted that Roberts' hearing, speaking, understanding, memory, concentration, persistence, and adaptation were all normal.  Tr. 860.

10

        **c.**        **State Agency Reviewing Physicians**

On October 22, 2009, state agency physician W. Jerry McCloud, M.D., reviewed the record and completed a Physical Residual Functional Capacity assessment.  Tr. 450-57.  He opined that Roberts could perform medium work (i.e., could lift and/or carry 50 pounds occasionally and 25 pounds frequently, could stand/walk or sit for 6 hours in an 8-hour workday) with frequent climbing of ramps/stairs and occasional climbing of ladders, ropes, and scaffolds. Tr. 451-52.

On October 26, 2010**,** a second state agency physician, Willa Caldwell, M.D., reviewed the record and completed a Physical Residual Functional Capacity assessment.  Tr. 862-69.  She opined that Roberts retained the ability to perform a limited range of light work with a sit/stand option, i.e., could lift and/or carry 20 pounds occasionally and 10 pounds frequently and could stand/walk or sit for 6 hours in an 8-hour workday.  Tr. 862-69.  She also found that Roberts could occasionally climb ramps and stairs, could never climb ladders, rope, or scaffolds, and could occasionally crawl.  Tr. 864.

        **2.**        **Mental Impairments**

        **a.**        **Treatment History**

Roberts began seeing Nikula R. Reddy, M.D., on March 3, 2009, for treatment of his anger issues.  Tr. 559-60.  Roberts reported having anger management issues and stated that he would explode over little things.  Tr. 560.  A mental status examination revealed that Roberts was fully oriented with rapid, pressured speech but no hallucinations, delusions, or suicidal/homicidal thoughts.  Tr. 562.  His general intellectual functioning was noted to be in the average range.  Tr. 562.  Dr. Reddy diagnosed bipolar disorder NOS and assigned a Global

Assessment of Functioning (GAF) of 60.[3]  Tr. 563.  She prescribed Lithium and Dalmane.  Tr. 571.

Roberts returned to Dr. Reddy on March 17, 2009, and reported that he lost his job for "violent tendencies and threats."  Tr. 564.  Dr. Reddy noted that Roberts' anger was a little better.  Tr. 564.  Upon examination, Dr. Reddy noted that Roberts was fully oriented, had an anxious mood, and that his concentration, insight/judgment, and general fund of knowledge were fair.  Tr. 564.  Dr. Reddy specifically noted that Roberts' interpersonal relationships were "good."  Tr. 564.  Dr. Reddy's diagnosis was unchanged and she assigned Roberts a GAF of 61.[4]  Tr. 564.  At a follow-up appointment on April 3, 2009, Roberts stated that he was "doing better," had a job interview, and was getting along "well" with his wife.  Tr. 565.  Dr. Reddy obtained blood tests to check Roberts' Lithium level and assigned a GAF of 62.  Tr. 565.

Roberts saw Dr. Reddy on May 1, 2009, and reported that he was "doing better," and that his anger and sleep were better.  Tr. 566.  Roberts stated that he was still looking for work.  Tr. 566.  Dr. Reddy assigned a GAF of 63.  Tr. 566.  At an appointment on June 30, 2009, Roberts stated that he was unable to find work and noted that his wife had also been laid off.  Tr. 567.  Dr. Reddy noted that Roberts had an angry mood and decreased appetite and sleep.  Tr. 567.  Dr. Reddy also noted that Roberts' grooming, concentration, and general fund of knowledge were all fair and that his interpersonal relationships were good.  Tr. 567.  Dr. Reddy assigned a GAF of 60.  Tr. 567.  At an appointment on July 7, 2009, Roberts stated that he was "doing better" and

---

[3] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *See* DSM-IV-TR, at 34.

[4] A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *See* DSM-IV-TR, at 34.

was looking for a job.  Tr. 568.  His GAF improved to 62.  Tr. 568.

On August 7, 2009, Roberts saw Dr. Reddy and reported that his anger issues were less and that his wife thought he was doing better with medication.  Tr. 569.  However, Roberts reported having "racing thoughts" and difficulty sitting still.  Tr. 569.  Dr. Reddy again noted that Roberts' concentration and general fund of knowledge were fair and his interpersonal relationships were good.  Tr. 569.  She assigned a GAF of 60.  Tr. 569.  At a follow-up appointment on September 1, 2009, Roberts was again reported that he was "doing better."  Tr. 570.  Roberts indicated that his wife was also happy with his improvement.  Tr. 570.  Dr. Reddy noted that Roberts' concentration and general fund of knowledge were fair and his interpersonal relationships were good.  Tr. 570.  She assigned a GAF of 61.  Tr. 570.

On October 6, 2009, Dr. Reddy completed a disability questioner for Roberts and indicated that he had been diagnosed with bipolar disorder NOS and had been experiencing mood swings, irritability, and anger for 10 years.  Tr. 447-49.  She also noted that Roberts had been compliant with his medication and appointments and that he responded "fairly well" to treatment.  Tr. 448.  Dr. Reddy opined that Roberts had a poor ability to tolerate work stress; poor concentration, persistence, and pace; poor frustration tolerance; and poor ability to handle confusion.  Tr. 448-49.  She stated that stress causes flare-ups of Roberts' symptoms. Tr. 449.

Roberts saw Dr. Reddy on five more occasions between November 2009 and August 2010.  Tr. 762-66.  At an appointment on November 6, 2009, Roberts reported that he was depressed with his job hunt. Tr. 766.  Dr. Reddy noted that Roberts was well-groomed, spontaneous, and coherent, but that his mood was anxious.  Tr. 766.  His concentration was noted as "fair" and his interpersonal relationships were noted as "good."  Tr. 766.  Dr. Reddy assigned a GAF of 61.  Tr. 766.  At his appointment on December 29, 2009, Roberts expressed

13

that the holiday season was bad for him.  Tr. 765.  His examination results were unremarkable and his GAF score was unchanged at 61.  Tr. 765.  At an appointment on February 23, 2010, Roberts' examination results were again unremarkable and his GAF score remained unchanged at 61.  Tr. 764.  At an appointment on May 18, 2010, Roberts noted that his back pain was bad.  Tr. 763.  A mental status examination was unremarkable and his GAF score remained unchanged at 61.  Tr. 763.  At Roberts' last visit with Dr. Reddy on August 17, 2010, he reported that his back pain had returned and that his health insurance had expired.  Tr. 762.  Dr. Reddy noted that Roberts was spontaneous, coherent, and fully oriented.  Tr. 762.  His mood was anxious but his affect was appropriate.  Tr. 762.  His concentration and general fund of knowledge were "fair."  Tr. 762.  Dr. Reddy's diagnosis was unchanged and she assigned a GAF of 60.  Tr. 762.  She also increased Roberts' prescription for Xanax.  Tr. 762.

On March 9, 2010, Dr. Reddy completed a second disability questionnaire for Roberts.  Tr. 583-84.  She noted that Roberts was preoccupied with unemployment and financial problems and was irritable to agitation.  Tr. 583.  She opined that Roberts had a very poor ability to tolerate stress; poor concentration, persistence, and pace; and poor frustration tolerance.  Tr. 583.  She also opined that Roberts had a poor ability to relate to coworkers and supervisors and found that "trivial stress can cause him agitation."  Tr. 583.  Dr. Reddy indicated that these symptoms have persisted for three years with a fair response to treatment.  Tr. 584.

### b.  State Agency Reviewing Physician

On October 23, 2009, Carl Tishler, Ph.D., reviewed the record and completed a Mental RFC Assessment and a Psychiatric Review Technique Form ("PRTF").  Tr. 458-71.  Dr. Tishler opined that Roberts did not have a severe mental impairment even though he had been diagnosed with bipolar disorder.  Tr. 458, 469.  Dr. Tishler also opined that Roberts had only mild

14

restrictions in activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  Tr. 468.  He further opined that Roberts was capable of carrying out simple and detailed task instructions.  Tr. 469.

**C.      Administrative Hearing**

**1.      Roberts' Testimony**

On November 14, 2011, Roberts appeared with counsel and testified at the administrative hearing before the ALJ.  Tr. 34-65.  With regard to his mental impairment, Roberts testified that he was not being treated for his bipolar disorder at the time of the hearing because he could not afford treatment.  Tr. 42.  He also stated that his treating physician, Dr. Reddy, stopped seeing him once he applied for state assistance.  Tr. 42.  Roberts stated that he lost three prior jobs because he was unable to get along with other people. Tr. 43.  He stated that he does not trust people and he has no anger control.  Tr. 43.  He also explained that his friends did not visit him anymore because of his confrontational attitude.  Tr. 44.

With regard to his physical impairments, Roberts explained that he had a surgery on his back (microdiscectomy decompression) in May 2010 and that he had some relief from the pain but the pain subsequently returned.  Tr. 44-45.  He stated that his back pain radiates down his right leg and described the pain as a sharp, throbbing pain.  Tr. 45.  He also testified that he was involved in a car accident in August 2010, which aggravated his back condition. Tr. 46.  Roberts was using a cane at the hearing and stated that he had been using it approximately 75% of the time for the past one and one-half years, but he admitted that it was not prescribed.  Tr. 48.  He explained that he used the cane for stability because he had fallen a few times.  Tr. 48.

Roberts testified that he could lift no more than 10 or 15 pounds.  Tr. 49.  He also stated that he could stand for 15 to 20 minutes at a time before needing to rest.  Tr. 49.  He stated that he could walk about a block before he would need rest, and that it would take him 10 to 15 minutes to walk around the block.  Tr. 49.  He further testified that he could sit for 20 to 30 minutes before he would need to rest or change positions.  Tr. 49.  Roberts stated that he would need to lie down for about 15 to 20 minutes before he would be able to sit, stand, or walk again.  Tr. 49-50.  He stated that he spends about three-fourths of the day lying on the couch.  Tr. 50.

### 2.    Vocational Expert's Testimony

Alena Kratanich (the "VE") appeared at the hearing and testified as a vocational expert.  Tr. 57-63.  She stated that Roberts had previously worked in a machine maintenance position (skilled position at the heavy exertional level), as well as an assembler of auto parts (unskilled position at the medium exertional level), welder (skilled position at the medium exertional level), material handler (semi-skilled position at the heavy exertional level), and machine builder (skilled position at the medium exertional level).  Tr. 59-60.  The ALJ asked the VE whether a hypothetical individual with Roberts' vocational characteristics and the following limitations could perform Roberts' past work or any other work in the national economy: can lift and carry 10 pounds occasionally; stand and walk two hours; sit six hours; requires a sit/stand option; and unable to bend, twist, climb, or crawl.  Tr. 60-61.  The VE testified that the hypothetical individual could not perform Roberts' past relevant work but could perform other jobs that existed in significant numbers in the national economy, including small parts assembler (220,00 jobs nationally and 21,000 jobs in Ohio); ticket checker (150,000 jobs nationally and 14,000 jobs in Ohio); and credit checker (70,000 jobs nationally and 6,000 jobs in Ohio).  Tr. 61.

In a second hypothetical, the ALJ added the following mental restrictions: can understand, remember, and carry out simple one to two-step job instructions but unable to perform work that requires directing others, abstract thought, or planning; can maintain attention and concentration to perform simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements or quotas; can have only superficial contact with supervisors and co-workers but no direct contact with the general public; can work in an environment with only occasional changes to the work setting and occasional work-related decision making.  Tr. 62.  Based upon these additional restrictions, the VE stated that the credit checker position would be eliminated but that the individual could still perform the other two positions, as well as the position of a document preparer (100,000 jobs nationally and 6,000 jobs in Ohio).  Tr. 62.  In a third hypothetical, the ALJ asked the VE to add an additional limitation that the individual would need to lie down for approximately 15 to 20 minutes up to 5 times per day.  The VE responded that there would be no jobs that such an individual could perform.  Tr. 63.

### III.  Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).  In making a determination as to disability under this definition, an ALJ

17

is required to follow a five-step sequential analysis set out in agency regulations.  The five steps

can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L.

Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this analysis, the claimant has the burden of proof at

Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

The burden shifts to the Commissioner at Step Five to establish whether the claimant has the

residual functional capacity ("RFC") and vocational factors to perform work available in the

national economy.  *Id.*

## IV.  The ALJ's Decision

The ALJ found that Roberts met the insured status requirements of the Act through

December 31, 2014.  Tr. 16.  At Step One of the sequential analysis, the ALJ determined that

Roberts engaged in substantial gainful activity during the following periods: August 2008

through March 2009.  Tr. 16.  However, the ALJ noted that there was a continuous 12-month

period during which Roberts did not engage in substantial gainful activity and, as a result, he

continued with the remaining steps of the sequential analysis for that period.  Tr. 17.  At Step

Two, the ALJ found that Roberts had the following severe impairments: degenerative disc

disease of the lumbar spine, status post micro decompression at L5-S1; diabetes mellitus;

obesity; and bipolar disorder.  Tr. 17.  At Step Three, the ALJ found that Roberts did not have an

impairment or combination of impairments that met or medically equaled one of the Listed

Impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1.[5]  Tr. 12-13.  The ALJ then determined

Roberts' RFC and found that he could perform sedentary work with the following limitations:

> [H]e requires the option to alternate position between sitting and standing.  He is
> unable to bend, twist, climb, or crawl.  He can understand, remember, and carry
> out simple 1-2 step job instructions, but would be unable to perform work that
> would require directing others, abstract thought, or planning.  He can maintain
> attention and concentration to perform simple, routine and repetitive tasks in a
> work environment free of fast-paced production requirements or quotas.  He can
> have only superficial contact with supervisors and coworkers, but no direct
> contact with the general public.  He can work in an environment with only
> occasionally [sic] changes to the work setting and occasional work-related
> decision-making.

Tr. 19-25.  At Step Four, the ALJ found that Roberts was unable to perform any past relevant

work.  Tr. 25.  At Step Five, after considering Roberts' vocational factors, RFC, and the

testimony of the VE, the ALJ found that Campbell was capable of performing other jobs that

existed in significant numbers in the national economy.  Tr. 26-27.  The ALJ thus concluded that

Roberts was not disabled. Tr. 27.

## V.  Arguments of the Parties

Roberts challenges the Commissioner's decision on one ground: that the ALJ did not

properly evaluate or consider the opinions of Dr. Lefkovitz and Dr. Reddy under the treating

---

[5]  The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P,
App. 1, and describes impairments for each of the major body systems that the Social Security Administration
considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age,
education, or work experience.  20 C.F.R. § 404.1525.

physician rule.[6]  In response, the Commissioner argues that the ALJ undertook a comprehensive

evaluation of the overall evidentiary record, properly evaluated the opinions of Dr. Reddy and

Dr. Lefkovitz, and reasonably determined that Roberts was not disabled.

## VI.  Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992).  The Commissioner's findings "as to any fact if supported by substantial

evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir.

2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the

evidence supports a claimant's position, a reviewing court cannot overturn "so long as

substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc.

Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor

resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d

383, 387 (6th Cir. 1984).

---

[6] In his brief on the merits, Roberts also suggests in passing that the ALJ did not properly analyze his complaints of pain.  Doc. 18, p. 17.  However, Roberts has failed to develop this argument or explain why the ALJ's credibility analysis was faulty.  "[I]ssues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."  *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."); *Meridia Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 868 (6th Cir. 2006); *see also Erhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 537 n. 5 (7th Cir. 1992) (applying waiver rule because judges need not devote time to "discussion of argument, raised if at all, 'in a very opaque manner.'").  Roberts has failed to develop his credibility argument beyond a cursory reference to the issue.  The Court will not speculate as to what Roberts' arguments might be.  This issue is therefore deemed waived.

**B.      The ALJ Properly Evaluated the Medical Source Opinions**

Under the treating physician rule, the opinion of a treating source is entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  If the opinion of a treating source is not accorded controlling weight, an ALJ must consider certain factors in determining what weight to give the opinion, such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(d), 416.927(d).

If an ALJ assigns less than controlling weight to a treating source's opinion, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544.  However, the ALJ is not obliged to set forth a detailed analysis with respect to each and every one of the factors listed above.  *See Francis v. Comm'r of Soc. Sec.*, 414 F. App'x. 802, 804 (6th Cir. 2011); *Allen v. Commissioner of Social Security*, 561 F.3d 646, 651 (6th Cir. 2009) (even a "brief" ALJ statement identifying such factors will be found adequate to articulate "good reasons" to discount a treating physician's opinion).

Roberts contends that the ALJ failed to follow the treating physician rule in evaluating the opinions of Dr. Lefkovitz and Dr. Reddy.  Doc. 18, pp. 11-18.  Each argument will be addressed in turn.

### 1. Dr. Lefkovitz

As discussed above, on November 16, 2011, Dr. Lefkovitz completed a medical source statement with regard to Roberts' physical impairments.  Tr. 918-20.  He opined that Roberts could stand/walk for 15 minutes at one time but would then have to sit or lie down and recline for 30 minutes at one time before standing/walking again, and could stand/walk for a total of 1 hour in an 8-hour workday.  Tr. 918.  He also opined that Roberts could sit for 30 minutes at one time but would then need to alternate his posture by lying down for 30 minutes at one time before sitting again, and could sit for a total of 2 hours in an 8-hour workday.  Tr. 918-19.  He found that Roberts could occasionally lift up to 10 pounds, occasionally balance, and could rarely/never stoop.  Tr. 920.  He also stated that Roberts would be absent from work more than 3 days per month due to his impairments or treatment.  Tr. 920.

At the outset, it should be noted that, although the ALJ assigned limited weight to the opinion of Dr. Lefkovitz, he did not completely reject that opinion.  Rather, as set forth in his RFC determination, the ALJ credited the opinion to the extent that Dr. Lefkovitz limited Roberts to sedentary work with a sit/stand option that did not require bending, twisting, climbing, or crawling.  Tr. 19, 23.  The ALJ evaluated the remaining limitations assessed by Dr. Lefkovitz, as well as the record as a whole, and reasonably assigned limited weight to the limitations assessed by Dr. Lefkovitz.  In reaching this conclusion, the ALJ explained that he gave limited weight to Dr. Lefkovitz's opinion because it was only partially supported by his own treatment notes and the treatment notes from Roberts' other treating physicians.  Tr. 23.  For example, the ALJ noted that, during Dr. Lefkovitz's initial evaluation of Roberts in October 2010, he noted positive straight leg raise and absent right ankle reflex.  Tr. 23.  However, his subsequent examinations of Roberts noted no evidence of neurological deficits, as he indicated that Roberts' motor strength

22

was 5/5, sensation to fine touch was normal, and deep tendon reflexes were 2 to 3+.  Tr. 23

(citing Tr. 870-80, 902-16).  In addition, the ALJ found that the severe limitations assessed by

Dr. Lefkovitz were inconsistent with his conservative treatment of Roberts.  Tr. 23.  The ALJ

noted that Dr. Lefkovitz treated Roberts exclusively with oral medications and Dr. Lefkovitz

noted that such medications helped alleviate Roberts' pain. Tr. 23.  The ALJ's explanation

demonstrates that he properly considered the regulatory factors and discounted Dr. Lefkovitz's

opinion based on the supportability of the opinion and the consistency of the opinion with the

record as a whole.  The ALJ therefore stated good reasons for assigning less than controlling

weight to Dr. Lefkovitz's opinion and fulfilled his obligations under the regulations.  *See, e.g.,*

*Allen*, 561 F.3d at 651 (finding that an ALJ provided good reasons for discounting treating

physician opinion where the ALJ's stated reason was brief but reached several of the factors an

ALJ must consider when determining what weight to give non-controlling opinion); *Bledsoe v.*

*Barnhart*, 2006 WL 229795, at *4 (6th Cir. 2006) ("The ALJ reasoned that Dr. Lin's conclusions

are 'not well supported by the overall evidence of record and are inconsistent with other medical

evidence of record.' This is a specific reason for not affording controlling weight to Dr. Lin.").

The reasons provided by the ALJ for discounting Dr. Lefkovitz's opinion are supported

by substantial evidence.  Significantly, no other treating physician of record, including Dr.

Taliwal, who performed Roberts' surgery in May 2010, stated or implied that Roberts was

incapable of performing any work whatsoever due to his physical impairments.  Further, based

upon a comprehensive physical examination in September 2010, Dr. Scheatzle, the state agency

consulting physician, opined that Roberts retained the ability to perform a reduced range of

sedentary work despite his impairments.  Tr. 854-61.  Agency regulations provide that state

agency reviewing sources are highly skilled medical professionals who are experts in social

security issues.  *See* 20 C.F.R. § 416.927.  Furthermore, both state agency reviewing physicians, Drs. McCloud and Caldwell, opined that Roberts retained the physical capacity to perform more than sedentary work despite his impairments.  Tr. 450-57, 862-69.  This evidence is inconsistent with the severe limitations found by Dr. Lefkovitz in his medical source statement.

In addition, Roberts was able to perform a wide range of daily activities.  In a functional report dated September 25, 2009, Roberts stated that he was able to care for his pets, attend to his personal care independently, participate in household tasks including cleaning and laundry, drive a truck, shop in stores every three to four days, and manage his finances.  Tr. 145-47.  Roberts also reported that he watched television on a daily basis.  Tr. 49, 145.  The ability to engage in these daily activities contradicts the severe limitations found by Dr. Lefkovitz.

All of this evidence supports the ALJ's determination that Roberts could perform a limited range of sedentary work.  Roberts, however, cites to other evidence in the record and argues that it shows that his impairments were more severe than found by the ALJ.  Doc. 18, pp. 16-17.  Even if there is evidence to support Roberts' position, "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."  *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted).  "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference."  *Id*. at 773 (citations omitted).  In this case, the ALJ reviewed the entire record, weighed the evidence, and concluded that Roberts retained the ability to perform a limited range of sedentary work with a sit/stand option and no bending, twisting, climbing, or crawling.  Even assuming there is evidence in the record that supports Roberts' claim that he was more limited than found by the ALJ, substantial evidence also supports the ALJ's conclusion.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir.

2003) ("if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ," the Commissioner's decision cannot be overturned).  Based on the applicable standard of review set forth above, the ALJ's decision is therefore affirmed.

### 2.    Dr. Reddy

Dr. Reddy completed two medical source statements with regard to Roberts' mental impairments.  In her first assessment, Dr. Reddy noted that Roberts suffered from bipolar disorder NOS and had experienced mood swings, irritability, and anger for 10 years.  Tr. 447-49. She also noted that Roberts had been compliant with his medication and appointments and that he responded "fairly well" to treatment.  Tr. 448.  Dr. Reddy opined that Roberts had a poor ability to tolerate work stress; poor concentration, persistence, and pace; poor frustration tolerance; and poor ability to handle confusion.  Tr. 448-49.  She also found that stress causes flare-ups of Roberts' symptoms.  Tr. 449.  In her second assessment, Dr. Reddy reaffirmed her diagnosis of bipolar disorder and opined that Roberts had a very poor ability to tolerate stress; poor concentration, persistence, and pace; and poor frustration tolerance.  Tr. 583.  She also opined that Roberts had a poor ability to relate to coworkers and supervisors and noted that "trivial stress can cause him agitation."  Tr. 583.  Dr. Reddy indicated that these symptoms have persisted for three years with a fair response to treatment.  Tr. 584.

The ALJ evaluated Dr. Reddy's opinions, as well as the record as a whole, and reasonably assigned little weight to those opinions.  The ALJ explained that he gave little weight to Dr. Reddy's opinions because they were contrary to her own treatment notes.  Tr. 23.  The ALJ found it significant that there were inconsistencies between Dr. Reddy's October 2009 assessment and her March 2010 assessment, which he found evidenced Dr. Reddy's reliance on

Roberts' subjective complaints rather than the objective medical evidence in reaching her conclusions regarding Roberts' mental limitations.  Tr. 23.  A physician's opinion based on a claimant's subjective allegations, rather than the medical evidence, is not entitled to significant weight.  *Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 391 (6th Cir. 2004).  Further, the ALJ's explanation demonstrates that he properly considered the regulatory factors and discounted Dr. Reddy's opinions based the supportability of her opinions and the consistency of her opinions with the record.  The ALJ therefore stated good reasons for assigning less than controlling weight to Dr. Reddy's opinions and fulfilled his obligations under the regulations.  *See Allen*, 561 F.3d at 651; *Bledsoe*, 2006 WL 229795, at *4.

The reasons provided by the ALJ for discounting Dr. Reddy's opinions are supported by substantial evidence.  The ALJ correctly noted that the severe limitations found by Dr. Reddy, such as poor concentration (Tr. 449, 583) and poor interaction (Tr. 583), were inconsistent with her own treatment notes.  For example, Dr. Reddy's treatment notes consistently documented that Roberts had fair concentration, not poor concentration.  Tr. 562, 564-70, 762-73.  She also uniformly described Roberts' interpersonal relationships as good.  Tr. 564, 566-70, 763-71, 773.  Similarly, despite the fact that Dr. Reddy opined that Roberts' functioning was poor in several areas, she routinely documented GAF scores indicating that Roberts was experiencing only mild to moderate symptoms.  Tr. 448-49, 563-70, 583-84, 762-73, 778.  And, as acknowledged in Dr. Reddy's second assessment, Roberts' condition improved with medication.  Tr. 584.  This evidence is inconsistent with the severe limitations set forth by Dr. Reddy in her medical source statements.

In sum, the ALJ reviewed the entire record, weighed the evidence, and concluded that Roberts retained the ability to perform simple, unskilled work with only superficial social

interaction.  In reaching this conclusion, the ALJ applied the correct legal standard and provided good reasons for assigning less than controlling weight to Dr. Reddy's opinions.  Substantial evidence supports this determination.  Accordingly, the ALJ's decision is affirmed.

### VII.  Conclusion

For the foregoing reasons, the final decision of the Commissioner denying Plaintiff Kraig D. Roberts' application for DIB is AFFIRMED.

Dated: May 13, 2013

Kathleen B. Burke
United States Magistrate Judge